UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **ALONZO LEWIS,** ) | |
| ) | |
|    **Plaintiff,** ) | |
| ) | |
| **v.** ) | Civil Action Number |
| ) | **2:14-cv-01965-AKK** |
| **UNITED STATES STEEL** ) | |
| **CORPORATION FAIRFIELD** ) | |
| **WORKS,** *et al.***,** ) | |
| ) | |
|    **Defendants.** ) | |

## MEMORANDUM OPINION

Alonzo Lewis's amended complaint alleges violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12112 *et seq.* ("ADA"), retaliation under 42 U.S.C. § 2000e-3(a), and violations of the Age Discrimination in Employment Act, 29 U.S.C. § 623(a) ("ADEA"), against his former employers, United States Steel Corporation Fairfield Works and United States Steel Corporation, Pittsburgh, Pennsylvania (collectively, "U.S. Steel"). Doc. 20. The court has for consideration U.S. Steel's motion for summary judgment, doc. 41, which is fully briefed, docs. 42; 48; 50, and ripe for review. For the reasons stated below, the motion is due to be granted.

## I.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original). The moving party bears the initial burden of proving the absence of a genuine dispute of material fact. *Id.* at 323. The burden then shifts to the non-moving party, who is required to go "beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324 (internal citations and quotation marks omitted). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 244 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual dispute will be resolved in the non-moving party's favor when sufficient competent

evidence supports that party's version of the disputed facts. B*ut see Pace v. Capobianco*, 238 F.3d 1275, 1276–78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that a jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II.   FACTUAL BACKGROUND

U.S. Steel hired Lewis, whom it documented as hearing impaired, in 2006 as a general laborer at its Fairfield, Alabama plant. *See* docs. 20-1 at 1; 43-3 at 6. In approximately 2008, Lewis became an oiler and held this position until his discharge in 2014. *See* doc. 43-4 at 27. As an oiler, Lewis worked at an unenclosed, exposed workspace on the mill floor. *See* doc. 43-2 at 11. U.S. Steel uses audiovisual warning systems to alert pipe mill employees that cranes, forklifts, and/or railcars, are in motion. *See* doc. 43-2 at 9. The need to hear warning alarms is important because, as Lewis's former supervisor Kirk

Zmyslowski testified: "We have EOT [electric overhead traveling] cranes that carry 10 tons of pipe throughout the building. We have railroad tracks that cross over. We have forklift traffic — high-volume forklift traffic. It's a manufacturing floor, very fast pace[d]." Doc. 43-2 at 8–9. Although Lewis is hearing impaired, as of June 2007, Lewis was still able to hear warning alarms (albeit, with some difficulty), as confirmed by an empiric test of his ability to hear in the plant environment. *See* doc. 43-4 at 72. Specifically, "Lewis was able to make out the crane alarm from approximately 150 feet away, the backup alarm for the straddle car and forklift gave him trouble, he had to concentrate on them to pick them out from the noise level present during operations." *Id.* While at work, Lewis kept his hearing aids in his pocket, because U.S. Steel's required safety ear muffs caused "amplification" and unintelligible "back feed" when worn in conjunction with Lewis's hearing aids. Doc. 43-4 at 20–21. Thus, Lewis admittedly could not hear well during his shifts and primarily communicated with his coworkers and supervisors via handwritten notes. Docs. 43-1 at 14; 43-4 at 5.

In February of 2014, Lewis's co-worker Jeremiah Parrish notified a supervisor named John Milkay that Lewis was "leaning up against a rail car" as an overhead crane approached and did not appear to notice the alarm. Doc. 43-6 at 20. Lewis denies this particular incident, *see* doc. 43-4 at 12, but admits that he sometimes could not hear the alarms in the plant, *see id.* at 13. Parrish's report

4

caused Milkay to contact Dr. Cheryl Szabo, the Medical Director of Fairfield Works and an occupational physician, *see* doc. 43-3 at 4, 10, to schedule a hearing test known as the "2N Warning Signal Evaluation" for Lewis. Doc. 43-6 at 19–20.[1]

Industrial Hygienist Alan Radenbush conducted the test with a representative of Lewis's union present on February 10, 2014. *See* doc. 43-8 at 9. Lewis failed to: (1) "understand verbal instructions and necessary conversation"; (2) "hear and react[] to mobile equipment horns and back-up alarms"; (3) "hear and react[] to overhead crane sirens"; (4) "hear and react[] to other warning signals/alarms"; and (5) "hear and react[] to all warning signals and auditory safety cues in the workplace under usual working conditions, while wearing required hearing protection." *See* doc. 43-4 at 73. Three days after the test, U.S. Steel gave the security guard a typed note to give to Lewis when Lewis arrived for his shift, stating that U.S. Steel would not permit Lewis to enter the mill due to safety concerns. *See* doc. 43-4 at 33–34.[2] The note further instructed Lewis to report to

---

[1] The 2N designation indicates that "hearing protection [*i.e.*, earmuffs] may impair [the employee's] ability to hear warning signals." Doc. 43-3 at 5.

[2] The note stated, pertinent part:

The results from the industrial study need to be discussed with medical. You are required to be at Dr. Szabo's office at the USS medical building at 8am 12/14/14.

USS is not allowing you to come to work as it is potentially hazardous for you to perform your regular duties.

Dr. Szabo's office the following morning to discuss the results of the 2N hearing test. *See id.* During the meeting, Lewis proposed possible accommodations, including transfer to a vacancy in the toolroom, warehouse, or to one of the "expeditor jobs," or simply allowing Lewis to continue navigating the plant by observing the visual component of the mobile equipment's audiovisual alarm systems. *See* doc. 43-4 at 34. According to Shea Moses, U.S. Steel's "resident expert" on "what . . . people [in finishing and shipping] really do," *see* docs. 43-1 at 14; 43-2 at 27, each of the jobs Lewis identified as possible accommodations required the occupant to "be aware of [his] surroundings[, and] hearing is critical to that," *id.* at 24.

Lewis's supervisor Kirk Zmyslowski, who had only worked at the pipe mill for a few months, *see* doc. 43-2 at 33, conducted the investigation into possible accommodations for Lewis, with assistance from Moses. Although Zmyslowski "tr[ied] to place [Lewis] in any job that he could to keep [Lewis] employed," doc. 43-2 at 14, he only considered other possible jobs in which Lewis would have "zero exposure." *See* doc. 43-2 at 15. That is, Zmyslowski would not permit

---

<blockquote>
USS will pay you for your missed shift. 2/14 A turn.

Multiple attempts were made to contact you between 3:30 PM and 5:00 PM on 2/13/14 by Mrs. McGaughy.

A message was left on 1 of the 4 numbers listed for you.
</blockquote>

Doc. 43-2 at 70.

Lewis to work any job "[o]n or around or near" any "mobile equipment or overhead cranes," even if the job resulted in exposure to mobile equipment for only "seconds" of each shift. *Id.* at 21, 24.[3] Zmyslowski ultimately determined that Lewis could not perform any job inside the mill, because all of the jobs entailed "some exposure" to mobile equipment. *See* doc. 43-2 at 23. As a result, Zmyslowski removed Lewis from his position as an oiler and would not allow him to "come back into work" due to the "potential hazard" caused by Lewis's hearing deficiency. *See* doc. 43-2 at 8. Zmyslowski admits that he conducted no audit of possible jobs, doc. 43-2 at 36, no inquiry into possible restructuring of various jobs in order to reduce or eliminate exposure to mobile equipment, *id.* at 35, or examination of the frequency of travel patterns for mobile equipment in each of the job areas, *id.* at 45.

### III.   ANALYSIS

Lewis alleges four claims in his amended complaint: (1) a violation of 42 U.S.C. § 12112(a) by "remov[ing] him from the oiler position because of his hearing impairment and/or fail[ing] to provide a reasonable accommodation that would allow him to remain actively employed," *see* doc. 20 at 5; (2) a "fail[ure] to properly treat the results of [his] examination and/or his medical condition with

---

[3] Zmyslowski testified that he "didn't really study how much exposure there was" for the other labor grade 2 jobs. Rather, he "looked for any exposure." Doc. 43-2 at 23.

appropriate confidentiality as required under 42 U.S.C. § 12112(d)(4)," *see id.* at 6; (3) retaliation in violation of 42 U.S.C. § 2000e-3(a) by removing him from his employment as a result of his filing an EEOC charge, *see id.* at 7; and (4) age discrimination in violation of 29 U.S.C. § 623(a), *see id.* at 8. Because Lewis states that he does not oppose summary judgment as to "the age discrimination claim and the medical information claim," doc. 48 at 30, U.S. Steel's motion as to these claims is due to be granted. As such, the court will only analyze Lewis's claims of disparate treatment, failure to provide a reasonable accommodation, and retaliation in Sections A, B, and C, below.

### A. Disparate Treatment

Lewis alleges that U.S. Steel violated § 12112(a)[4] of the ADA when it removed him from his position. Doc. 20 at 5. Where, as here, Lewis does not allege direct evidence of discrimination, the court will analyze Lewis's claim under the *McDonnell Douglas* burden-shifting framework. *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007); *Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000). To establish a *prima facie* case of discrimination, Lewis must show that: (1) he had a real or perceived disability; (2) he was otherwise qualified to perform the essential functions of the job; and (3) his employer

---

[4] 42 U.S.C. § 12112(a) provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees, . . . and other terms, conditions, and privileges of employment."

8

discriminated against him based on his disability. *See Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002). At issue here is whether Lewis was a "*qualified individual* with a disability." *See* doc. 42 at 19 (emphasis added). According to U.S. Steel, Lewis is not a "qualified individual" because Lewis posed a "direct threat to the health or safety of himself or others," based on Lewis's documented inability to consistently hear warning signals while inside the plant. *See id.* at 20, 22. The court agrees.

The ADA permits an employer to require "that an individual . . . not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b).[5] Whether an employee poses a "direct threat" impacts whether the employee was "otherwise qualified." *See Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1284 (11th Cir. 2001) ("Waddell, because he is infected with the fatal, contagious disease of HIV, is a direct threat to his workplace, and therefore not a qualified individual under the ADA."); *Pinckney v. Potter*, 186 F. App'x 919, 925 (11th Cir. 2006) ("[A]n individual is . . . not a 'qualified individual' if, by performing the duties of a given position, he would pose a 'direct threat' to himself."). In analyzing whether an individual poses a direct threat to himself or others, contrary to Lewis's assertions, *see* doc. 48 at 30–

---

[5] Regulations have extended the definition of "direct threat" to include threats to the worker himself. *See* 29 C.F.R. § 1630.2(r); *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 87 (2002) (upholding 29 C.F.R. § 1630.2(r)).

35, in the Eleventh Circuit, the employee "carries the burden of establishing that 'he was not a direct threat or that reasonable accommodations were available.'" *Waddell*, 276 F.3d at 1280 (quoting *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 836 (11th Cir. 1998)).

Lewis concedes that he is hearing-impaired, *see* doc. 48 at 7, that he failed to hear the alarms while working in the mill on at least some occasions, *see* doc. 43-4 at 13, and that U.S. Steel documented him as having failed the 2N hearing field test it administered four days before removing him from his position, *see id.* at 73. Nonetheless, Lewis argues that he did not pose a "direct threat" because he had successfully worked in the mill for eight years without incident and, as such, U.S. Steel cannot show a "high probability" of harm. *See* docs. 48 at 37–38; *id.* at 31 (citing 29 C.F.R. § 1630.2(r)) (EEOC interpretative guidance stating that a direct threat requires a showing that, in performing the particular functions of a job, there is a "*high probability* of substantial harm to the individual") (emphasis added). To support his contention, Lewis argues that other judges on this court have previously considered "performance without incident" as one factor in concluding that the evidence presented a jury question as to direct threat. *See* doc. 48 at 37–38 (citing *Pollard v. Drummond Co.*, No. 2:12-cv-03948-MHH, 2015 U.S. Dist. LEXIS 120279, at \*\*19–23 (N.D. Ala. Sept. 10, 2015) (employee used methadone to treat pain from a back injury without incident for several years, and a conflict in

10

testimony between defense expert and treating physician about whether the plaintiff could safely work in a coal mine). The reliance on *Pollard* misses the mark, in part, because in *LaChance v. Duffy's Draft House*, a case in which a restaurant discharged a fry cook who suffered from seizures due to "direct threat," *see id.* at 834, the Eleventh Circuit held that an affidavit from the plaintiff's supervisor indicating that the plaintiff had worked around fryers and other electrical cooking appliances without incident for 13 months, "[did] not overcome [the plaintiff's] own admission and his doctor's statement that he posed a risk of harm," and that "[s]uch evidence [did] not create an issue of fact." 146 F.3d at 835. Moreover, *Pollard* is distinguishable because it involved the use of prescribed medications that, medical literature recognizes, may have different effects on each patient. In that respect, the *Pollard* court correctly recognized the need for individualized medical or objective proof that the medication negatively affected the plaintiff's workplace safety. Here, during the 2N hearing test, Lewis failed to hear and react to various warning signals and verbal instructions. *See* doc. 43-4 at 73. In other words, U.S. Steel's determination that Lewis's hearing deficiency posed a direct threat was based on *objective*, *individualized* evidence, and not on stereotypes about persons with auditory difficulties. *See Lowe v. Alabama Power Co.*, 244 F.3d 1305, 1308 (11th Cir. 2001) ("To prevent the very reliance on stereotype and related perceptions of an individual's limitations that the

ADA prohibits, an employer must point to particularized facts about the specific person's condition to support its decision.").

On balance, in view of the foregoing authorities, Lewis has failed to meet his burden of showing that he did not pose a direct threat.  He does not present any expert testimony to contradict the results of U.S. Steel's hearing test, and he admits he could not always hear warning alarms.  *See* doc. 43-4 at 13.  His assertion that "nothing bad has happened" for eight years falls short, especially in light of his testimony that his hearing has deteriorated during the course of his employment.  *See* doc. 43-4 at 20 (Q:  "Could you hear better when you started at U.S. Steel in 2006 than when you left in 2014?"; A:  "Yes.").  For all of the foregoing reasons, Lewis cannot show that he was a qualified individual and, therefore, cannot establish a *prima facie* case.

Alternatively, even if Lewis can make a *prima facie* case, his claim still fails because U.S. Steel has articulated a legitimate, nondiscriminatory reason for removing Lewis from his position:  safety concerns due to his inability to hear warning signals.  *See Corder v. City of Bessemer*, No. 2:14-cv-02133-RDP, 2016 U.S. Dist. LEXIS 98860, at *23 (N.D. Ala. Jul. 28, 2016) (safety is a legitimate, nondiscriminatory reason for discharge); *Scruggs v. Berg Spiral Pipe Corp.*, No. 14-339-CG-B, 2015 U.S. Dist. LEXIS 80374, at **14–15 (S.D. Ala. June 22, 2015) (same).  To prevail, Lewis must present evidence of pretext by showing

"such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Sheridan v. E.I. Dupont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996)). Lewis attempts to make this showing through his contention that Milkay's "handling of the alleged incident" in which his coworker Jeremiah Parrish observed him failing to notice an overhead alarm was a "pretext to have [him] removed by the medical department," as evidenced by Milkay's failure to "interview any of the employees involved in the alleged incident and made no written reports." Doc. 48 at 45. This contention is unavailing because even though Milkay did not investigate or draft an incident report, he immediately telephoned Dr. Szabo to discuss the incident, *see* docs. 43-3 at 24; 43-6 at 19, a fact Lewis does not challenge. Moreover, Lewis testified that he knows of no reason why Milkay would have lied about this incident, *see* doc. 43-4 at 12–13, and, indeed, Lewis has not presented an affidavit from Parrish or any other employee to refute Milkay's contention about receiving the report from Parrish. *See Fickling v. United States*, 507 F.3d 1302, 1304 (11th Cir. 2007) ("Once [the moving party's initial] burden is met, the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor.").

Lewis also attempts to undermine U.S. Steel's proffered legitimate reason by pointing out that Alan Radenbush, the Industrial Hygienist who performed Lewis's 2N hearing evaluation, "allowed [Lewis] to return to his work area after the test," doc. 48 at 22. This attempt fails because it was "not part of [Radenbush's] job to evaluate whether [Lewis] could work safely in [the plant] environment," and Radenbush "made no recommendations regarding [Lewis's] work." *See* doc. 43-8 at 16, 18. While "evidence demonstrating that *the decisionmaker* engaged in the same policy violation proffered for an employee's termination" can be "especially compelling evidence of pretext," *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1366 (11th Cir. 1999), there is no evidence that Radenbush was a "decisionmaker" or that he had authority to "allow" or "disallow" Lewis from completing his shift following the evaluation.

In light of Lewis's failure to meet his burden of establishing that he is a qualified individual or that U.S. Steel's articulated reason is pretextual, U.S. Steel's motion as to Lewis's disparate treatment claim is due to be granted.

## B. Failure to Provide a Reasonable Accommodation

In addition to challenging U.S. Steel's decision to remove him from the oiler position, Lewis also asserts a claim for failure to provide a reasonable accommodation. "The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of her job rests with that

14

employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000) (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997)). Relevant here, Lewis suggested several accommodations to U.S. Steel, including transfer to the positions of "toolroom attendant," "warehouse," or "expeditor," or simply allowing him to continue observing only the visual alerts on the cranes, forklifts, and other mobile equipment, without the audible alerts.[6] Docs. 43-4 at 34; 48 at 38. As an initial matter, Lewis has failed to meet his burden of presenting evidence that any of the positions he identified were vacant. Instead, Lewis testified only that "I know they had the, you know, somewhere for me to go work in different areas, warehouse, toolroom, but none of that was offered." Doc. 43-4 at 34. Such testimony falls short of satisfying Lewis's burden of identifying accommodations, *see Mervyn*, 207 F.3d at 1367, especially in light of the unrefuted evidence from U.S. Steel that there were no vacancies for "toolroom attendant" or any jobs in Lewis's paygrade

---

[6] Lewis also mentions, during litigation, accommodations such as providing him an escort to help him navigate the facility, giving him a vibrating pager in lieu of audio alarms, and allowing him to wear attire that indicates to other employees that he is hearing-impaired. However, because there is no evidence that Lewis suggested these possible accommodations to U.S. Steel in February 2014, the court will not consider these. *See Fussell v. Georgia Ports Authority*, 906 F. Supp. 1561, 1570 (S.D. Ga. 1995). Likewise, for the same reasons, the court will not consider the "pulpit" positions Lewis references in his brief, doc. 48 at 41, and because "a sentence in an unsworn brief is not evidence." *Travaglio v. Am. Express Co.*, 735 F.3d 1266, 1269 (11th Cir. 2013); *see also id.* at 1270 (quoting *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980)) ("'Statements by counsel in briefs are not evidence.'").

in the warehouse or as an expeditor, doc. 43-10 at 3, and that the warehouse or expeditor positions would have been a promotion for Lewis, *see* doc. 42 at 25 (citing doc. 43-10 at 3). The court adds that even if the warehouse or expeditor positions were vacant, U.S. Steel had no obligation to transfer Lewis to them because "[t]he reassignment duty . . . does not require the employer to . . . promote a disabled employee." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001) (citations omitted).

The court also disagrees with Lewis's contention that it would have been "reasonable" for U.S. Steel to simply continue allowing him to observe only the visual component of the plant's audiovisual alarm system. As U.S. Steel notes, "[s]ound is needed to convey directionality of warnings, and as to the fact that mobile equipment operators use horns and back-up alarms to signal their presence at blind corners and in other locations where the mobile equipment may not be visible to another employee. Visual signals alone would not be effective." Doc. 42 at 26. More importantly, however, the visual system clearly did not alert Lewis to the movement of the crane on the day when Lewis's co-worker reported Lewis failed to react to the presence of potential danger. There are legitimate business reasons why employers are concerned about workplace safety. After all, industrial plants are filled with hazards that employees must be attuned to in order to minimize accidents that may cause severe or fatal injuries or just impact the bottom

line. *See EEOC v. Stoughton Trailers, L.L.C.*, No. 08-cv-748-slc, 2010 U.S. Dist. LEXIS 62279, at \*\*4–5, 12, 25, 36 (W.D. Wis. June 23, 2010) (granting employer's motion for summary judgment on basis of "direct threat" because employee could not "hear[] bells, alarms and verbal communication" and worked in a production environment where there was "continual motion" of cranes, forklifts, and motorized golf carts). A court cannot overlook these legitimate concerns by finding that the risk is overblown simply because the affected employee has worked for years at the plant without an incident. To do so in this case in particular would require that the court ignore Lewis's admission that exposure to the mill environment has caused his hearing to worsen, which, of course, further increases the danger he faced and posed. On this record, the court cannot find that U.S. Steel acted unreasonably when it rejected Lewis's request to maintain the status quo.

Finally, Lewis contends that Kirk Zmyslowski conducted an "inadequate and incomplete" investigation. Doc. 48 at 25. Zmyslowski admits that he eliminated positions that entailed "any exposure" to cranes or mobile equipment, even if that exposure was limited to "seconds in a day" when Lewis was walking to and from the restroom or to and from lunch. Doc. 43-2 at 23–24. Lewis further attacks Zmyslowski's method of evaluating other possible jobs, including Zmyslowski's recent tenure at the plant, his purported unfamiliarity with the duties

17

and work areas of each of the jobs, and his admission that he did not conduct audits of possible jobs, doc. 43-2 at 30, and his failure to invite a representative of Lewis's union to participate in discussions of possible accommodations, *see* doc. 49-4 at 1. Such arguments are unavailing because, "where a plaintiff cannot demonstrate 'reasonable accommodation,' the employer's lack of investigation into reasonable accommodations is unimportant." *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997) (citing *Moses*, 97 F.3d at 448).

Due to the lack of evidence of any vacancies within Lewis's pay grade, and, more importantly, the substantial evidence that Lewis would not be qualified for any possible vacancies in jobs he suggested because he would still be exposed — at least to some degree — to mobile equipment and could not hear the warning signals, Lewis cannot satisfy his burden of proving that U.S. Steel failed to make reasonable accommodations. Therefore, for all these reasons, U.S. Steel's motion as to the failure to make reasonable accommodations claim is due to be granted.

### C. Retaliation

Finally, Lewis contends that U.S. Steel retaliated against him for filing an EEOC charge by subjecting him to the 2N hearing evaluation and thereafter using the results to remove him from his position. *See* doc. 43-4 at 80. To support his contention, Lewis challenges U.S. Steel's position that it requested the test based on a report from a co-worker, stating that Milkay, who purportedly received the

report from the co-worker, did not draft an incident report, and no one ever told Lewis that the alleged incident instigated the hearing test. *See id*. at 17. At issue here is whether Lewis can establish a *prima facie* case of retaliation by showing there is a causal relation between his protected activity and the adverse employment action. *See* doc. 42 at 29–30; *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994). "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (quoting *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000)). As U.S. Steel correctly observes, there is no evidence that Zmyslowski, or any other person involved in requiring the 2N test or in Lewis's removal from the plant — including Shea Moses, whom Lewis named in the charge —, had knowledge of Lewis's EEOC charge. *See* docs. 42 at 29; 48 at 46; 43-4 at 40.[7] In light of Lewis's failure to present evidence that any person directly or indirectly involved in his removal

---

[7] *See* doc. 43-4 at 40 (Q: "[D]o you have any evidence that Dr. Szabo knew that you had made [the January 2014] EEOC complaint?"; A: "I have no idea."); *id.* (Q: "Do you have any evidence that Mr. Milkay knew that you had made this EEOC complaint in January of 2014?"; A: "This one right here? I have no idea."); *id.* (Q: "Or Mr. Moses, any reason to think that he had knowledge that you had made this EEOC charge in January of 2014?"; A: "I have no idea."); *id.* (Q: "Do you have any reason to believe that Mr. Zmyslowski knew that you had made this EEOC complaint in January of 2014?"; A: "I have no idea other than notifying themselves, the EEOC notifying them."); *id.* at 40–41 (Q: "And then Mr. Rowdenbush [*sic*], you don't have any information that Mr. Rowdenbush [*sic*] was informed about this EEOC complaint. . . .?"; A: "No, sir. Other than the EEOC notifying them themselves."); *id.* at 41 (Q: "Do you have any information as to what Ms. Kristen McGaughy's knowledge would have been as to whether or not you had filed this January 17, 2014 EEOC complaint?"; A: "No, I do not.").

knew about his EEOC charge, Lewis cannot show that his protected expression was the cause of the adverse employment action against him.  Moreover, Lewis has presented no credible evidence, other than unfounded speculation, for his contention that a co-worker's report did not trigger the 2N test or that retaliatory animus, rather than safety concerns, factored into U.S. Steel's decision to require that Lewis submit to the test.  Therefore, U.S. Steel's motion as to Lewis's retaliation claim is due to be granted.

## IV.   CONCLUSION

For all of the reasons stated above, U.S. Steel's motion for summary judgment, doc. 41, is due to be granted.  The court will enter a separate order consistent with this Memorandum Opinion.

**DONE** the 20th day of December, 2016.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE